**Michelle Sweet, OSB No. 060015**
**Assistant Federal Public Defender**
**101 S.W. Main Street, Suite 1700**
**Portland, Oregon 97204**
**Tel:    (503) 326-2123**
**Fax:    (503) 326-5524**
**Email:michelle_sweet@fd.org**

**Attorney for Defendant**

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 1:21-cr-00237-RDM-1** |
| **Plaintiff,** | **DEFENDANT'S SENTENCING MEMORANDUM** |
| **vs.** | |
| **JONATHANPETER ALLEN KLEIN,** | |
| **Defendant.** | |

Mr. Klein was only 21 years old on January 6, 2021.  Mr. Klein grew up outside of the United States with very religious missionary parents.  He was home-schooled, and when he returned to the United States in February 2020, he was living on his own with his brothers in the greater Portland, Oregon, area while his parents lived in Texas.  He experienced the most isolating part of the COVID-19 pandemic fairly detached from much of his family.  In addition, his re-introduction to the United States included shock at how the protests in Portland unfolded.  As a result, Mr. Klein was very supportive of President Trump.  He found common

**PAGE 1.    DEFENDANT'S SENTENCING MEMORANDUM**

cause with Proud Boys, who also supported President Trump during the very difficult summer and fall of 2020 in Portland, Oregon.  Mr. Klein traveled to Washington, D.C., to support President Trump at a rally.  His acts after that rally are something Mr. Klein regrets, and, in looking back, he wishes he never would have traveled to Washington, D.C., at that time.  His regret reflects his extremely aberrant behavior, to which he has pleaded guilty.  Ex. 1, 3, and 5.

Mr. Klein has worked hard since that time, and since his arrest nearly four years ago, to focus on complying with the Court's orders on pre-trial release and on building a life with his family that is sustainable and productive even with a felony conviction.  Ex. 4.  It is a life much different from what Mr. Klein hoped for when he was 21 years old on January 6, 2021.  We ask the Court to impose a sentence of time served with a term of supervised release.

## ADVISORY GUIDELINE CALCULATION

There is no dispute between the defense and the government about the advisory guideline calculation.  First, Mr. Klein has no criminal history and is therefore in Criminal History Category I.  Second, the Offense Levels for the two counts are as follows:

| COUNT 1: 18 U.S.C. § 231(a)(3) | |
|---|---|
| Base offense level, § 2A2.4(a) | 10* |

*Pursuant to USSG § 3D1.4(c), because the offense levels between these two non-grouping counts are greater than 9, for guideline calculations, the offense levels for Count 1 (group 1) are disregarded.

**PAGE 2.    DEFENDANT'S SENTENCING MEMORANDUM**

| COUNT 2: 18 U.S.C. § 111(a) | |
|---|---|
| Base offense level, § 2A2.2(a) | 14 |
| Official Victim Adjustment, § 3A1.2(a)(b) | +6 |
| Acceptance of Responsibility | -3 |
| Adjusted Offense Level | 17 |
| Criminal History Category | I |
| Advisory Guideline Range | 24-30 months |

The probation office has recommended that the Court should impose a "dangerous weapon" enhancement pursuant to USSG § 2A2.2(b)(2)(B). PSR ¶ 75. This should be rejected. In Mr. Klein's Statement of the Offense, he agreed he took action "with the intent to commit another felony, i.e., to obstruct, impede, or interfere with officers." There is nothing indicating an intent to commit bodily injury. For an "instrument that is not ordinarily used as a weapon" to be included as a dangerous weapon, it must have been involved in the offense with the intent to commit bodily injury. USSG § 2A2.2 App Note. Definitions—"Dangerous weapon." There was no such intent here, and the government is not recommending that this enhancement should be applied.

The government has recommended a mid-range sentence of 26 months. The defense is free to seek whatever sentence is reasonable. Here, the defense recommends a sentence of time served.

**PAGE 3.    DEFENDANT'S SENTENCING MEMORANDUM**

**RESTITUTION AND FINE**

The parties agreed that Mr. Klein should pay $3,000 in restitution, along with the required $100 fee assessments per count. That restitution and the fee assessments have already been paid in full to the Clerk of the Court.

The government recommends that Mr. Klein pay a fine. A fine is not warranted. In this case, Mr. Klein qualified for court appointed counsel. In addition, he provided financial information to the probation office. The Presentence Report (PSR) reflects that Mr. Klein does not have a significant income, he shares a small home with his brothers, and he does not have any significant assets. The PSR notes, "The defendant appears to have limited assets. He does not appear to have the ability to pay a fine in this case, in addition to restitution." PSR at ¶ 130. The government did not object to the PSR or any of these findings. The probation office is not recommending a fine be imposed in this case. Mr. Klein has made a sufficient showing that a fine is not appropriate in this case.

**DEFENSE SENTENCING ARGUMENT**

This Court's consideration of the sentencing guidelines, the sentencing factors found in 18 U.S.C. § 3553(a) as applied to Mr. Klein, warrant a sentence of time served. The sentencing guidelines are, of course, only advisory. *See United States v. Booker*, 543 U.S. 220, 245 (2005). While a sentencing court must consider the guidelines range in fashioning a sentence, in the end, the "overarching" consideration is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing[...]." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). As stated by the Supreme Court, in the final analysis "punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 488 (internal quotation and citation omitted).

PAGE 4.    DEFENDANT'S SENTENCING MEMORANDUM

The sentencing factors under 18 U.S.C. § 3553(a) call on this Court to fashion a sentence that is "sufficient, but not greater than necessary" to meet four goals: just punishment, deterrence, protection of the community, and rehabilitation. Further, under 18 U.S.C. § 3582, the court, in considering the factors in § 3553(a) and their applicability, should recognize "*that imprisonment is not an appropriate means of promoting correction and rehabilitation.*" 18 U.S.C. § 3582(a) (emphasis added).

> As just noted, that section instructs courts to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation." A common— and in context the most natural—definition of the word "recognize" is "to acknowledge or treat as valid." Random House Dictionary of the English Language 1611 (2d ed.1987). And a thing that is not "appropriate" is not "suitable or fitting for a particular purpose." Putting these two definitions together, § 3582(a) tells courts that they should acknowledge that imprisonment is not suitable for the purpose of promoting rehabilitation. And when should courts acknowledge this? Section 3582(a) answers: when "determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, [when] determining the length of the term." So a court making these decisions should consider the specified rationales of punishment except for rehabilitation, which it should acknowledge as an unsuitable justification for a prison term.

*Tapia v. United States*, 564 U.S. 319, 326–27 (2011) (internal citations omitted). Here, Mr. Klein should receive a variance from the guidelines, as the applicable § 3553(a) sentencing factors support a below guidelines sentence of time-served in this case.

### A.    Mr. Klein's Reaction To The Violent Protests In Portland, Oregon After A Recent Return To The United States At The Beginning Of The COVID Pandemic Exposed Him To The Proud Boys.

A summary of much of Mr. Klein's childhood is provided in the Social History Report filed under seal at Ex. 1 and in the PSR at paragraphs 95 through 98. This memorandum highlights the juxtaposition of Mr. Klein's extremely sheltered upbringing with what he experienced when he returned to the United States in February 2020. Ex. 1 at 2-4.

Before Mr. Klein was born, his parents made the decision to alter their lives and become strict missionaries and travel the United States, and then other countries, spreading their religious word. Exs. 1, 2, and 3. They felt it was best to homeschool their seven children. For many years, Mr. Klein's entire world was his family and their travel trailer. He recalls how he was desperate to leave their trailer and have some amount of freedom and childhood fun. The only way that he could do that was by working—which he has done since he was a young boy living in Argentina and Chile. Ex. 1 at 4. This work provided Mr. Klein the opportunity to become fluent in Spanish and provided him with the funds to pay for things that he needed and wanted. Mr. Klein grew up with a tremendous amount of respect for authority and family, as well as other cultures, knowing the importance of working hard for what you need and want, and without a lot of exposure to the wider world. Exs. 1 and 2.

1. *Mr. Klein's Return To The United States In February 2020*

Just prior to the start of the COVID-19 pandemic, the Klein family returned to the United States from Chile. *See* Ex. 1 at 4-5, and Exs. 4 and 5. The parents went to Texas, and Mr. Klein—now 20 years old—was left to live with his brother Matthew in a trailer on the property of an extended family member who lived just outside the greater Portland area. When the entire world was shutting down, with people leaving employment and businesses shuttering, Mr. Klein again went to work. *See* Exs. 4 and 5. He quickly gained two jobs—one as a roofer and one working at a pizza restaurant. To say that Mr. Klein's return to the United States was culture-shock is an understatement. This shock turned to frustration after the protests began around Portland after the murder of George Floyd. Ex. 5. What Mr. Klein watched happen to the police, to downtown Portland, to police stations around the Portland area, could not be

PAGE 6.    DEFENDANT'S SENTENCING MEMORANDUM

reconciled with his respect for authority.  He felt compelled to stand up against what he viewed as unlawful and disrespectful violence. Ex. 5.

### 2. *Mr. Klein's Introduction To The Proud Boys In August 2020*

The violence and destruction in the Portland area caused Mr. Klein to attend some events to show his support for police.  Ex. 5.  It was at one of these events on August 22, 2020, when Mr. Klein witnessed members of Antifa throwing water bottles at a number of women who were also attending the event.  Exs. 4 and 5.  During this event, a group of Proud Boys arrived, and the members of Antifa backed down.  This was not before Mr. Klein himself was attacked.  Ex. 1 at 6, Exs. 4 and 5.  At the time of the attack, Mr. Klein was pulled to safety by a member of the Proud Boys.  He felt grateful that they stepped in to help him, and viewed the Proud Boys with respect for the authority they projected.  One of the Proud Boys gave Mr. Klein contact information for the group.

Mr. Klein later made contact with the Proud Boys, and over the next few months, met more Proud Boys, feeling part of a group that held the same respect for authority that he did. They encouraged him to be ready for attacks from Antifa and showed him how to protect himself with body armor.  He attended a few additional rallies with Proud Boys during the Fall of 2020. He was inspired and encouraged by local Proud Boys leaders to attend President Trump's rally in Washington, D.C., on January 6, 2021.  Exs. 4 and 5.

### 3. *Mr. Klein's Experience On January 6, 2021*

Although at first, he was not serious about attending, Mr. Klein mentioned to his brother Matthew that he thought it would be fun to go to the rally in Washington, D.C.  Matthew Klein then made the travel arrangements, and Mr. Klein grew excited for a trip to support the President.  He arranged for time off work, and he and his brother Matthew traveled to Delaware

**PAGE 7.    DEFENDANT'S SENTENCING MEMORANDUM**

where they stayed with their sister.  Matthew Klein rented a car, and they traveled into

Washington, D.C., the day before the rally and then again on January 6, 2021, to attend President

Trump's "Stop the Steal" rally.  Ex. 1 at 6-7.  Mr. Klein was proud to be there, as he very much

supported President Trump.  He wore Proud Boy gear to the rally, which included a Proud Boy

shirt, hat, and colors.  He also wore body armor as he had learned to do at the rallies he attended

in Oregon.  He later learned that Proud Boys who were very involved and knowledgeable in the

planning of the actions at the Capitol were not supposed to wear identifying clothing or gear.

        As Mr. Klein left the rally, he followed the crowd to the Capitol building.  At the time, he

was not sure where the crowd was headed.  Initially, he thought that the crowd was going to the

outside of the Supreme Court because of the lawsuits going on about the counting of ballots.  He

then realized where they were headed.  He did pause on the grounds of the Capitol—near what

looked like a construction site.  It was at that time he was handed a lid of a speaker and was told

to throw it—which he did—into a crowd of people in front of him.  This crowd included Capitol

police officers, and, unfortunately, one was hit in the helmet.  At the time, Mr. Klein was

unaware that anyone was hit by the lid as there were so many people in the crowd, and he could

not see where the lid went.  Mr. Klein very much regrets this act and feels terrible that the officer

was harmed.

        Mr. Klein continued to the Capitol building, entered, and walked around.  Several people

saw his Proud Boys gear and greeted him as a fellow Proud Boy.  He left the building and then

returned to the building with his brother Matthew and a few other Proud Boys.  It was at this

time he forced open a door with another person.  Immediately after he did this, he backed away,

shocked at what he had done.  Mr. Klein and his brother left the Capitol and returned to their

**PAGE 8.    DEFENDANT'S SENTENCING MEMORANDUM**

sister's home in Delaware. They flew back the next day. Mr. Klein was full of regret and disappointment at his actions—actions that were very out of character for him.

### 4. Mr. Klein's Decisions After January 6, 2021

When Mr. Klein returned, he quickly wanted to separate himself from what had happened in Washington, D.C. He discarded his Proud Boys gear, left the Portland area, and moved to Eastern Oregon. There, he lived in a trailer on an expansive hunting ranch and felt better in the big open spaces away from the city. Ex. 1 at 8, Ex. 4. He received much appreciated support from his boss on the ranch. He maintained contact with some Proud Boys in Eastern Oregon, but, after discussing this relationship with his boss, he quickly decided that he really wanted to distance himself from the Proud Boys and simply focus on working hard—something that has always grounded him. It had long been a dream of Mr. Klein's to own his own hunting ranch one day, so he dove into the work on the ranch to learn everything he could. He was arrested on March 23, 2021, and, due to the charges, and what he is now convicted of, he knows he had to give up that dream. Ex. 4. Instead, his life has had to permanently adjust due to his actions and conviction.

**B.    After His Arrest, Mr. Klein Took Responsibility For His Actions, Complied With Strict Pre-Trial Release Conditions, And Has Led An Exemplary Life Focused On Being Productive And Building A Future With His Family.**

Mr. Klein accepted responsibility in this case very early on—very shortly after his arrest. He has regularly expressed to the government his intent to plead guilty and accept responsibility for his actions. He did not file any pre-trial motions. The parties agree he has accepted responsibility, which is also reflected in his conduct before the Court and his time on pre-trial release. In addition, Mr. Klein worked with the government to arrange for pre-payment

of the $3,000.00 restitution and the $200 in fee assessments due to the Court which has now been

paid in its entirety.

>    1.  *Mr. Klein's Life On Strict Pre-Trial Release Conditions And The Gradual*
>        *Reduction Of Those Conditions Over A Period Of 42 Months*

Mr. Klein is grateful that he was ordered released and that he has been allowed to be on

pre-trial release for three and a half years.  Ex. 4.  It is also true that his time on pre-trial release

has had significant periods of onerous supervision.  Ex. 4, PSR ¶¶ 20-31.  Despite that, Mr. Klein

complied, remained in good communication with his pre-trial officer, respected the Court's rules

and orders, and has slowly been able to earn greater freedom while on pre-trial release.  His

extended time of restrictions in the community has accomplished the punishment and deterrence

functions of custody.  *See Pepper*, 562 U.S. 476, 491.

When Mr. Klein was first on pre-trial release in May 2021, he had to live separately from

his brother Matthew.  He was placed on location monitoring and had a home detention schedule.

He resided with friends of his parents, one of whom acted as a third-party custodian and was

required to provide written declarations to the Court regarding Mr. Klein's compliance. *See* Ex 1

at 8.

At that time, Mr. Klein worked for Keystone RV.  Ex. 2 at 3.  He also worked at his

third-party custodian's home helping with home repairs in exchange for rooming there.  During

this time, Mr. Klein's understanding of American culture developed beyond his ex-pat

perspective.  Ex. 1 at 8.  During this period, Mr. Klein was also permitted to travel, under the

custodianship of his sister, to North Plains, Oregon, to attend the wedding of their brother.  In a

few months, in August 2021, Mr. Klein's location monitor schedule was reduced to curfew.  In

December 2021, it was determined that the third-party custodian, no longer needed to submit the

**PAGE 10.    DEFENDANT'S SENTENCING MEMORANDUM**

monthly declarations, but rather had an obligation to report to the Court only if there were any issues. Mr. Klein was also allowed to travel to his parents' home over the Christmas holiday in December 2021; his sister, once again, acted as the third-party custodian. *See* Ex. 4.

In August 2022, over a year after he was released, it was agreed that Mr. Klein no longer needed a third-party custodian. In addition, although he remained on location monitoring, he no longer needed to abide by a curfew schedule. He was also permitted to move his residence and he and his brother, Matthew, moved together into the house owned by his parents in Baker City, Oregon. In a few months, his travel permissions were extended to the District of Oregon. Ex. 4, PSR ¶ 27.

Once in Baker City, Mr. Klein first worked for Harney Rock and Paving for about seven months. For the last two years, he has been working with his brothers' company, Klein Bros LLC, an asphalt company. Ex. 4. Mr. Klein is a valued worker, and the customers appreciate his work. Ex. 1 at 8.

It was not until July 26, 2023, that the location monitoring was removed. PSR ¶ 29. Mr. Klein was on location monitoring for 26 months. Mr. Klein has successfully remained on pre-trial release for another 15 months since then with fewer travel restrictions. In total, by the time of the sentencing hearing, Mr. Klein will have been on pre-trial supervision for 42 months—with more than half of that on location monitoring. Although this has allowed Mr. Klein to be with his family and work hard, it was not without intense supervision and limited freedom. Mr. Klein complied with that supervision, and he has also been able to prove to the federal justice system, including this Court, that he can remain in the community and follow any rules and conditions of supervision that this Court imposes. Ex. 4.

**PAGE 11.   DEFENDANT'S SENTENCING MEMORANDUM**

*2. Mr. Klein's Life Now And His Plans For The Future.*

Mr. Klein has moved into a house owned by his parents in Baker City.  He lives there with his brothers Matthew and Phillip.  Their aunt lives across the street.  Mr. Klein's brothers have started an asphalt services company and Mr. Klein works for that company.  Mr. Klein handles many of the sales and the client and customer relationships.  During the recent fire season, the brothers' company was contracted to work on a large fire in Eastern Oregon.  Mr. Klein did that for several weeks over two months.  He is very proud of this work because he knows how important it is for his community.  Ex. 4.

Mr. Klein has long been valued by many people in his community.  Two of these people wrote support letters for this Court.  Both people have known Mr. Klein since his childhood and know who he is now.  One, a pastor, confirms that "[he] is know by reputation as a hard, reliable worker that does a good job, a productive member of society."  Ex. 2 at 1.  Another, Mr. Hernandez, a family friend, worked with Mr. Klein while he was on pre-trial release.  Ex. 2 at 3.  Mr. Hernandez recognized the goodness and respect Mr. Klein has for others, noting how valuable he was at the place of employment as well as visiting Mr. Hernandez regularly after Mr. Hernandez had eye surgery.  Ex. 2 at 3.

Mr. Klein is going to continue to work hard, be a valuable and integral part of his family, and do whatever he can to make his community one that is safe and just.  Mr. Klein's family has recognized how much he has matured over the past years. Ex. 1 at 9. They also recognize the unique confluence of events that brought Mr. Klein in contact with the Proud Boys and his participation in January 6th.  They firmly believe that if they had returned at a different time, none of this would have happened to Mr. Klein.  Ex 1 at 9.  Mr. Klein continues to have a tremendous amount of respect for authority and specifically the police.  That will not change.

**PAGE 12.    DEFENDANT'S SENTENCING MEMORANDUM**

C.    **The Consequences Already Suffered As Well As Post-Offense Rehabilitation Have Accomplished The Legitimate Goals Of Sentencing Under 18 U.S.C. § 3553(a).**

This Court is assessing the needs for deterrence, punishment, protection of the public, and rehabilitation in deciding whether to impose a term of imprisonment and, if so, for how long. A critical factor here is that the defendant has no prior criminal record and was quite young at the time of his offense. His personal background is extraordinary in that he was very sheltered from the world but raised to be hard-working, Biblically virtuous, and respectful of authority. The aberrant behavior on January 6th has already resulted in life-changing consequences: a felony conviction, three-and-a-half years under court supervision, often with close conditions of confinement and supervision, and humiliation before his community as a lawbreaker.

The government seeks to compare Mr. Klein with another person convicted in the January 6th prosecution—Jacob Zerkle (ECF 190 at 16). This comparison fails to note several distinct differences. First. Mr. Zerkle was much older than Mr. Klein at the time of the offense conduct. Mr. Zerkle was close to 50 years old, while Mr. Klein had barely turned 21 years old. Second, the government described Mr. Zerkle's behavior as "hand-to-hand combat" with at least three different officers. *United States v. Jacob Zerkle*, Case No. 22-cr-100 (RBW), ECF 82 at 18-20.

In Mr. Klein's case, he threw a speaker lid into a crowd. It is very unfortunate and serious that it hit an officer, but it was thrown from a distance, with no one target and could have very easily just dropped to the ground or hit someone other than an officer. It is accurate that Mr. Klein entered the capitol building and forcibly opened a door. But there was no specific assaultive behavior from Mr. Klein while he was in the Capitol building. The exercise of comparing one case to another is fraught with differences and it reminds the Court that the

PAGE 13.    DEFENDANT'S SENTENCING MEMORANDUM

sentencing of an individual should be made of the individual. The guidelines provide a starting point, and the 3553(a) factors provide the additional considerations, of which other imposed sentences is only one factor.

In *Pepper*, the Supreme Court elaborated on how post-offense rehabilitation reflects on almost every single sentencing factor under § 3553(a). *Pepper*, 562 U.S. at 491-93. Here, there is no reasonable concern regarding safety in the community, and rehabilitation, to the extent needed, has been fully accomplished. Deterrence and punishment has been reasonably accomplished through the felony convictions and extensive restrictions on liberty for over three years. The requested time-served sentence is sufficient, but not greater than necessary, to accomplish the legitimate goals of sentencing.

## CONCLUSION

The events that bring Mr. Klein before the Court today happened nearly four years ago. Mr. Klein has been successfully living in the community under the significant authority of the federal court system since his release in May 2021. Mr. Klein has been punished and has long been deterred from any further unlawful action. The community is better with Mr. Klein in it—it does not need protection. And Mr. Klein's ability to build a thriving life despite his felony conviction is proof that any rehabilitation that was needed has been accomplished. Any further prison sentence in this case is unnecessary, a waste of resources, does nothing for the community, and does not serve the goals of sentencing.

Respectfully submitted this 25th day of November, 2024.

*/s/ Michelle Sweet*
Michelle Sweet
Attorney for Defendant

**PAGE 14.    DEFENDANT'S SENTENCING MEMORANDUM**